CLIFFORD W. and SUSAN B. CRITTENDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crittenden v. Commissioner
Docket No. 3084-86
United States Tax Court
T.C. Memo 1990-156; 1990 Tax Ct. Memo LEXIS 180; 59 T.C.M. (CCH) 202; T.C.M. (RIA) 90156; March 22, 1990
Clifford W. Crittenden, pro se. Margaret Hebert, for the respondent. FEATHERSTON
*357 MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: *181 Respondent determined deficiencies in petitioners' Federal income tax in the amounts of $ 2,706 for 1981 and $ 43,499 for 1982, together with additions to tax for 1982 of $ 10,777 under section 6659, [1] $ 757 under section 6661, $ 2,175 under section 6653 (a)(1), and 50 percent of the interest due on the 1982 deficiency under section 6653 (a)(2). The parties have filed a stipulation resolving several issues raised in the pleadings. The only issue remaining for decision is whether any part of petitioners' underpayment of tax attributable to a loss claimed with respect to Western Reserve Oil & Gas Co., Ltd. was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653 (a)(1) and (2). For convenience, we shall combine our findings of fact and opinion. At the time the petition was filed, petitioners were legal residents of Sparks, Nevada. Petitioners filed an income tax return for 1982 on which they disclosed interest income of $ 249,992 plus other taxable income in excess of $ 90,000. They claimed deductions for losses of *182 approximately $ 250,000. Included in the losses was a deduction of $ 67,943 with respect to a tax shelter limited partnership known as Western Reserve Oil & Gas Co., Ltd. (Western Reserve). The deficiency for 1982 stems in large part from respondent's determination that petitioners improperly reported the tax results of their dealings with Western Reserve in which they made a $ 17,000 cash investment in December 1982. Based on an audit of Western Reserve's partnership return for 1982, respondent increased petitioners' taxable income by $ 74,146, determining that the loss of $ 67,943 claimed on petitioners' return was not allowable and that petitioners' distributive share of Western Reserve's income for the year was $ 6,203. In , the Court held that Western Reserve was not engaged in a trade or business *358 within the meaning of section 162(a) and that the whole partnership arrangement lacked economic substance. Most of the deductions claimed by the partnership as well as the partnership loss deductions passed through the partnership to the partner-investors were not, therefore, allowable. Petitioners in this *183 proceeding do not contest that holding, limiting the issues to the applicability of the section 6653 (a)(1) and (2) additions to tax. Western Reserve was a tax shelter organized and promoted by Trevor Phillips (Phillips) and Terry Mabile (Mabile), neither one of whom had any oil and gas business experience. Only individuals in the 50-percent income tax bracket were eligible to invest in the partnership. The shelter scheme was designed to work as follows. As a limited partnership, Western Reserve's declared purpose was to acquire oil and gas leases, develop them, and produce and sell oil and gas. Investors in the partnership were to pay cash of $ 1,000 for each unit of interest and were to make a minimum cash investment of $ 10,000. In addition, each investor was to sign two nonrecourse notes payable within 12 and 24 months, respectively, each in the face amount of the cash investment, and three long-term purportedly recourse notes, each in an amount equal to four times the cash investment. The three long-term notes were payable within 19, 20, and 21 years, respectively. The promotional material emphasized that the long-term notes, though purportedly recourse obligations, would *184 be converted to nonrecourse obligations or paid from oil and gas production. The documentation called for the creation of Magna Energy Corp. (Magna), whose stock was to be owned 95 percent by Mabile and 5 percent by a William Brannan. Magna was to locate and acquire oil and gas leases and then assign them to Western Reserve without retaining any interest therein. In practice, Western Reserve paid for the leases and acquired them directly from the owners. Purportedly, as consideration for the assignments, Western Reserve was to give Magna three long-term promissory notes, respectively payable within 19, 20, and 21 years from the end of the investment year. The amounts of these long-term notes were to be unrelated to the value of any leases acquired during the year but were to be equal to four times the amount of the cash paid in by the investors in that year. Thus, Western Reserve acquired an interest in only one lease in 1981 at a cost of only $ 4,000 but, at the end of the year, gave Magna three notes, each for $ 20,584,000 (four times the partners' total 1981 cash investment), a total of over $ 61,000,000. Western Reserve acquired interests in four leases in 1982 at a cost *185 of approximately $ 40,000 to $ 48,000 and entered into five exploration agreements with a commitment figure of $ 92,000; Western Reserve gave Magna three notes, each for $ 38,760,000, a total of over $ 116,000,000. These notes for both years were purportedly secured by the investor-to-Western Reserve notes described above. The long-term Western Reserve-to-Magna notes were described as advance minimum royalties. Western Reserve had adopted the accrual method of accounting. Western Reserve was to deduct as advance royalties the face amount of one of the long-term notes in the year in which associated investments were made by the investors and the face amount of one of the other two notes in each of the next two following years. Because the face amount of each of the three Western Reserve-to-Magna notes was to be equal to four times the total amount of the cash investment for the year, an investor was represented in the promotional material as entitled to deductions of $ 12 for each $ 1 invested, i.e., $ 4 for $ 1 in each of three years. The Western Reserve promoters made liberal provisions for themselves which alone, in ordinary circumstances, would foreclose the long-term success *186 of the venture. Following a detailed analysis of the provisions for the payments to be made to the promoters, the arrangements are summarized in , as follows: Thus, Phillips and Mabile, neither one of whom had any oil and gas business experience, took more than 20 percent (15 percent to Mabile as sales commissions and 5-1/2 percent to Phillips * * * as fees) of the total investments by Western Reserve's limited partners, leaving less than 80 percent available for use in the business. In addition, they created a mechanism for siphoning 65 percent of the to themselves [after discharging the nonrecourse notes], 30 percent to Phillips and 35 percent to Magna [95 percent owned by Mabile], until the Western Reserve-to-Magna notes in the face amount of $ 118 million were paid. This leaves only 35 percent of the gross receipts for the payment of severance taxes, all overhead, production, operating and other expenses, and any subsequent lease acquisitions and drilling expenses. Western Reserve's partnership returns for 1982 and 1983, the only years for which there was any operating experience, show that the cost of *187 goods sold alone ($ 56,488 for 1982 and $ 1,285,018 for 1983) far exceeded 35 percent of the gross receipts ($ 121,321 for 1982 and $ 1,338,670 for 1983) from oil and gas production. These cost of goods sold figures do not include the long list of deductions shown in our findings. [Emphasis in original; fn. ref. omitted.] Western Reserve deducted as advance royalties $ 20,584,000 in 1981 and $ 59,344,000 ($ 20,584,000 plus $ 38,760,000) in 1982 and *359 passed through to the investor-partners the losses created by those and other deductions. As noted above, respondent disallowed the loss deduction of $ 67,943 claimed by petitioners for 1982 and determined, among other things, that petitioners are liable for the section 6653(a)(1) and (2) additions to tax. Section 6653(a)(1) and (2) provides for additions to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do in the circumstances. ; . Petitioners *188 maintain that they acted prudently in making their Western Reserve investment and claiming Western Reserve losses on their 1982 tax return. We do not agree. Petitioner Clifford W. Crittenden (petitioner) testified that he is a retired Pan American Airlines pilot and that he has had extensive business and investment experience. He also testified that he read the Western Reserve prospectus and consulted four or five times with Jack Alexander (Alexander), a certified public accountant who had served as his business and tax advisor. Petitioner denied that he analyzed the provisions on which the advance royalty deductions were based or the provisions siphoning gross receipts to the promoters. Alexander advised him that the annual 4 for 1 write-off for the investment was reasonable, but petitioner admitted that before he made his investment, he took no steps to inform himself on Western Reserve's operating results in 1981 for which it reported a loss in excess of $ 20,000,000. Alexander testified at the trial of the instant case and the parties stipulated to the inclusion of his Ferrell case testimony in the record of the instant case. We are not certain whether petitioner contends *189 that he relied upon Alexander for financial advice or tax advice. As to the former, Alexander admitted at the Ferrell trial that he was not "an expert now and probably never will be" an expert in the oil and gas business. As to tax advice, it is true that Alexander is a certified public accountant but his testimony on the Western Reserve promotional material exhibited only a superficial study of the scheme. He "read the regulation and traced out a couple of the cases" himself. He reviewed and compared the promotional material circulated by other tax shelter promoters but his testimony shows that he did not carefully analyze either the promotional material or the pertinent facts as they developed. Rather, he relied mainly upon representations made to him by the promoters, Phillips and Mabile. His testimony exhibited a minimum grasp of oil and gas tax law principles. Alexander was one of the salesmen of the Western Reserve package. He admitted at the Ferrell trial that he received a 10 percent commission, shared in part with some associates, on his sales of three $ 10,000 units in 1981, 30 such units in 1982, and 30 to 40 such units in 1983. Petitioner testified that *190 he could not deny that he knew Alexander received a commission for placing the 17 units with him. Good faith reliance on a competent accountant's advice may insulate a taxpayer from the section 6653(a) addition to tax. , affd. on other issues ; see . In this case, however, petitioner did not receive or rely in good faith upon unbiased, objective tax advice from Alexander on the allowability of his Western Reserve deductions. No reasonable person with petitioner's business and investment experience would have expected the Western Reserve investment to work. , affg. a Memorandum Opinion of this Court; . It was unrelated to economic reality. Taxwise, it was too good to be true. It was an obvious and flagrant tax avoidance scheme. Petitioners were negligent in preparing and filing the 1982 income tax return on which they claimed the Western Reserve deductions. They *191 are liable for the section 6653 (a)(1) and (2) additions to tax. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩